UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Cr. No. 19CR10459 |
| | ) | |
| v. | ) | |
| | ) | |
| 1. MICHAEL CECCHETELLI, | ) | Violations: |
| A/K/A "KING MERLIN"; | ) | |
| 2. ESTHER ORTIZ, | ) | Count One: |
| A/K/A "QUEEN INDIA"; | ) | Conspiracy to Conduct Enterprise |
| 3. HECTOR MANUEL VEGA, | ) | Affairs Through a Pattern of |
| A/K/A "KING DEMON"; | ) | Racketeering Activity |
| 4. JORGE RODRIGUEZ, | ) | (18 U.S.C. § 1962(d)) |
| A/K/A "KING G"; | ) | |
| 5. MICHAEL MARRERO, | ) | Count Two: |
| A/K/A "KING CLUMSY"; | ) | Conspiracy to Distribute and to |
| 6. FRANCISCO LOPEZ, | ) | Possess with Intent to Distribute |
| A/K/A "KING CISCO"; | ) | Cocaine and Cocaine Base |
| 7. GREGORY PEGUERO-COLON, | ) | (21 U.S.C. § 846) |
| A/K/A "KING TRECE"; | ) | |
| 8. JUAN LIBERATO, | ) | Count Three: |
| A/K/A "KING PRODIGY"; | ) | Distribution and Possession with |
| 9. ANGEL ROLDAN, | ) | Intent to Distribute Cocaine |
| A/K/A "KING BIG A," | ) | (21 U.S.C. § 841(a)(1)) |
| A/K/A "NELTY"; | ) | |
| 10. FRUTUOSO BARROS, | ) | Count Four: |
| A/K/A "KING FRUITY"; | ) | Conspiracy to Distribute and to |
| 11. SANDRA CORREA, | ) | Possess with Intent to Distribute |
| A/K/A "QUEEN DREAM"; | ) | Fentanyl |
| 12. SHAUN HARRISON, | ) | (21 U.S.C. § 846) |
| A/K/A "REV"; | ) | |
| 13. VINCENT DZIERWINSKI, | ) | Count Five: |
| A/K/A "KING VICE"; | ) | Felon in Possession of Ammunition |
| 14. WILSON PEGUERO, | ) | (18 U.S.C. § 922(g)(1)) |
| A/K/A "KING DUBB"; | ) | |
| 15. ALEXIS PEGUERO, | ) | Count Six: |
| A/K/A "KING LEXI," | ) | Conspiracy to Distribute and to |
| A/K/A "KING LOONEY"; | ) | Possess with Intent to Distribute |
| 16. MATTHEW PALACIOS, | ) | Cocaine Base |
| A/K/A "KING NENE"; | ) | (21 U.S.C. § 846) |
| 17. STEVEN FAMILIA VALDEZ, | ) | |
| A/K/A "KING HAZE"; | ) | Count Seven: |
| 18. DANTE LARA, | ) | Felon in Possession of Ammunition |
| A/K/A "KING NASTY"; | ) | (18 U.S.C. § 922(g)(1)) |

SEALED

| | |
|---|---|
| 19. ROBERT LARA,<br>      A/K/A "KING RIZZ"; | ) |
| 20. ANGEL ORTIZ,<br>      A/K/A "KING ABBY"; | ) |
| 21. ANGEL RODRIGUEZ,<br>      A/K/A "KING ACE"; | ) |
| 22. ALEXIS VELASQUEZ,<br>      A/K/A "KING BOOBOO"; | ) |

**Count Eight:**
Felon in Possession of Firearms and
Ammunition
(18 U.S.C. § 922(g)(1))

**Count Nine:**
Felon in Possession of Firearm and
Ammunition
(18 U.S.C. § 922(g)(1))

RICO Forfeiture Allegation:
(18 U.S.C. § 1963(a))

Drug Forfeiture Allegation:
(21 U.S.C. § 853)

Firearm Forfeiture Allegation:
(18 U.S.C. § 924(d))
(28 U.S.C. § 2461(c))

19. ROBERT LARA,
    A/K/A "KING RIZZ";
20. ANGEL ORTIZ,
    A/K/A "KING ABBY";
21. ANGEL RODRIGUEZ,
    A/K/A "KING ACE";
22. ALEXIS VELASQUEZ,
    A/K/A "KING BOOBOO";
23. ANGEL CALDERON,
    A/K/A "KING BAM";
24. OSCAR PENA,
    A/K/A "KING O-BLOCK";
25. JOSE RODRIGUEZ,
    A/K/A "KING STUTTER";
26. ORLANDO SANTIAGO TORRES,
    A/K/A "KING LANDI";
27. ROBERT AVITABILE,
    A/K/A "BOBBY";
28. TALIYAH BARBOZA,
    A/K/A "QUEEN TALIYAH";
29. JOSUE CARRASQUILLO,
    A/K/A "KING PLAYBOY";
30. MICHAEL COTTO,
    A/K/A "KING GORDO";
31. JUAN FIGUEROA,
    A/K/A "KING PUN";
32. ISSAC FELIX-RIVERA,
    A/K/A "KING IZZY";
33. KEVIN GUADALUPE,
    A/K/A "KING MILLY";
34. SHELTON JOHNSON,
    A/K/A "KING SHELLS";
35. TYSON JORGE,
    A/K/A "KING MUSIC";
36. EMANUEL LOPEZ-VELEZ,
    A/K/A "MANNY";
37. LUIS MENDEZ,
    A/K/A "KING PRIMO";
38. RAEKWON PARIS,
    A/K/A "KING DEBO";
39. JAYCO REYES-SMITH,
    A/K/A "KING JAVY"
40. LUIS SANTIAGO,
    A/K/A "KING TINY";

41. ROBERTO VARGAS,                         )
      A/K/A "KING ROYALTY";                )
42. JOSE VASQUEZ,                           )
      A/K/A "KING FEARLESS";               )
43. NATANAEL VELAZQUEZ,                     )
      A/K/A "KING NAEL";                   )
44. ISRAEL RODRIGUEZ,                       )
      A/K/A "KING IMPERIAL";               )
45. ALFRED NIEVES,                          )
      A/K/A "KING ALFY";                   )
46. MARLON RIVERA,                          )
      A/K/A "KING PLUTO";                  )
47. INES LUGO,                              )
      A/K/A "QUEEN CHINA";                 )
48. JEREMIA MEDINA,                         )
      A/K/A "KING SWEEPY";                 )
49. BIENVENIDO NUNEZ,                       )
      A/K/A "KING APACHE";                 )
50. TANAIRY RUIZ,                           )
      A/K/A "QUEEN TANAIRY";               )
51. XAVIER VALENTIN-SOTO,                   )
      A/K/A "KING X";                      )
52. JOEL FRANCISCO,                         )
      A/K/A "KING CASPER";                 )
53. ERIC THOMAS,                            )
      A/K/A "KING E";                      )
54. ALVIN MOJICA,                           )
      A/K/A "KING HUMBLE";                 )
55. SOPHIA VELASQUEZ,                       )
      A/K/A "QUEEN SOPHIA";                )
56. DAIRON RIVERA,                          )
      A/K/A "KING MAFIA";                  )
57. HECTOR ADORNO,                          )
      A/K/A "KING GORDO";                  )
58. JESUS DIAZ,                             )
      A/K/A "KING KIKO";                   )
59. HENRY CARIBE,                           )
      A/K/A "KING 40CAL";                  )
60. JONATHAN CASSIANO,                      )
      A/K/A "KING LEGEND";                 )
61. ANTOINE GOODSON; and                    )
62. DEREK SOUTHWORTH,                       )

Defendants

3

## INDICTMENT

## COUNT ONE
Conspiracy to Conduct Enterprise Affairs Through a Pattern of Racketeering Activity
(18 U.S.C. § 1962(d))

The Grand Jury charges:

### Introduction

At all times relevant to this Indictment:

### The Enterprise

1.     The Almighty Latin Kings and Queen Nation criminal enterprise (hereinafter, the "LATIN KINGS"), was a criminal organization whose leaders, members and associates engaged in acts involving murder, robbery, assault, extortion, witness harassment, intimidation, and retaliation, various firearms offenses, laundering of monetary instruments, and the manufacture, importation, and distribution of controlled substances, and which operated in the District of Massachusetts, and elsewhere.

2.     The structure of the LATIN KINGS included, but was not limited to, the following:

a.     The LATIN KINGS were a violent street gang with thousands of members across the United States and overseas;

b.     The traditional power centers of the LATIN KINGS, and members of the gang's national leadership structure, were predominantly located in the Chicago (known as "KMC," or the "Motherland") and New York (referred to as the "Bloodline") metropolitan areas.

c.     The LATIN KINGS had a detailed and uniform organizational structure, which is outlined - along with various "prayers," codes of behavior, and rituals - in a

4

written "manifesto" widely distributed to members throughout the country, including, but not limited to, members in Massachusetts, and other states along the East Coast.

      d.    The Chicago-area LATIN KINGS were divided by the North and South Sides of Chicago, each led by the "Corona," the highest ranking member of the LATIN KINGS. Both Coronas reported to the overall LATIN KINGS leader, who is currently incarcerated and serving a life sentence in a federal prison.

      e.    The LATIN KINGS were further organized by geographic locations into Regions. Generally, each Region had a rank structure that included a Regional Overseer, the highest authority within the Region. The Regional Cacique is second-in-command of the Region. The Regional Enforcers served to support the Regional Overseer and to enforce discipline of, and adherence to, established LATIN KINGS rules and by-laws, as well as the orders of LATIN KINGS leaders. The Regional Leadership could also include a Regional Crown Council, which was comprised of a Crown Council Chairperson and Crown Council Members to assist in resolving disputes.

      f.    Each Region was comprised of States; within the States were individual Branches, Chapters, or Sections of the LATIN KINGS (hereinafter referred to as "Chapters"). In Massachusetts, the Chapters were generally named after the town or city where the Chapter was located, with the exception of Boston, which had two Chapters.

      g.    The Massachusetts LATIN KINGS had a centralized leadership structure responsible for all operations within Massachusetts (hereinafter, the "STATE TEAM"). The STATE TEAM was comprised of a leader (or Inca), a second in command (or Cacique), one or more Enforcers, a Treasurer, and a Secretary, who were

collectively tasked with maintaining the operations of each local Chapter. At one point in time, the STATE TEAM also had regional officers responsible for certain local Chapters located in different geographical regions of Massachusetts.

h.      In Massachusetts, there were ten Chapters of LATIN KINGS, all of which answered to the STATE TEAM. Among the ten Chapters were the Fitchburg Chapter, the Lawrence Chapter, the Lowell Chapter, the Worcester Chapter, the Springfield Chapter, the Lynn/Salem/Chelsea Chapter, MSB (named for the Morton Street Bricks housing project in Boston), D5K (named for Devon Street in Boston) and the New Bedford Chapter.

i.      Incarcerated LATIN KINGS' members also followed this leadership structure, with ranking jailhouse members in each facility.

j.      The STATE TEAM answered to the Regional Leadership, which, in this region, was known as the East Coast Leadership. The East Coast Leadership was comprised of an Overseer, a Cacique, an Enforcer, and a Crown Council Chairwoman. The other states that reported to the East Coast Leadership included New York, Rhode Island, Connecticut, New Jersey, North Carolina, and Florida. Each of those states in turn were comprised of State Leadership and individual Chapters situated in cities and towns.

k.      In addition to the State and Chapter Leadership, Massachusetts had a "Crown Council," a smaller group picked by the STATE TEAM to assist in resolving disputes among Chapters.

6

3. The following individuals were leaders, members, or associates of the LATIN KINGS:

1.    MICHAEL CECCHETELLI,
       A/K/A "KING MERLIN";

2.    ESTHER ORTIZ,
       A/K/A "QUEEN INDIA";

3.    HECTOR MANUEL VEGA,
       A/K/A "KING DEMON";

4.    JORGE RODRIGUEZ,
       A/K/A "KING G";

5.    MICHAEL MARRERO,
       A/K/A "KING CLUMSY";

6.    FRANCISCO LOPEZ,
       A/K/A "KING CISCO";

7.    GREGORY PEGUERO-COLON,
       A/K/A "KING TRECE";

8.    JUAN LIBERATO,
       A/K/A "KING PRODIGY";

9.    ANGEL ROLDAN,
       A/K/A "KING BIG A,"
       A/K/A "NELTY";

10.   FRUTUOSO BARROS,
       A/K/A "KING FRUITY";

11.   SANDRA CORREA,
       A/K/A "QUEEN DREAM";

12.   SHAUN HARRISON,
       A/K/A "REV";

13.   VINCENT DZIERWINSKI,
       A/K/A "KING VICE";

14.   WILSON PEGUERO,
       A/K/A "KING DUBB";

15.   ALEXIS PEGUERO,
       A/K/A "KING LEXI,"
       A/K/A "KING LOONEY";

16.   MATTHEW PALACIOS,
       A/K/A "KING NENE";

17.   STEVEN FAMILIA VALDEZ,
       A/K/A "KING HAZE";

18.   DANTE LARA,
       A/K/A "KING NASTY";

19.   ROBERT LARA,
       A/K/A "KING RIZZ";

20. ANGEL ORTIZ,
        A/K/A "KING ABBY";
21. ANGEL RODRIGUEZ,
        A/K/A "KING ACE";
22. ALEXIS VELASQUEZ,
        A/K/A "KING BOOBOO";
23. ANGEL CALDERON,
        A/K/A "KING BAM";
24. OSCAR PENA,
        A/K/A "KING O-BLOCK";
25. JOSE RODRIGUEZ,
        A/K/A "KING STUTTER";
26. ORLANDO SANTIAGO TORRES,
        A/K/A "KING LANDI";
27. ROBERT AVITABILE,
        A/K/A "BOBBY"
28. TALIYAH BARBOZA,
        A/K/A "QUEEN TALIYAH";
29. JOSUE CARRASQUILLO,
        A/K/A "KING PLAYBOY";
30. MICHAEL COTTO,
        A/K/A "KING GORDO";
31. JUAN FIGUEROA,
        A/K/A "KING PUN";
32. ISSAC FELIX-RIVERA,
        A/K/A "KING IZZY";
33. KEVIN GUADALUPE,
        A/K/A "KING MILLY";
34. SHELTON JOHNSON,
        A/K/A "KING SHELLS";
35. TYSON JORGE,
        A/K/A "KING MUSIC";
36. EMANUEL LOPEZ-VELEZ,
        A/K/A "MANNY";
37. LUIS MENDEZ,
        A/K/A "KING PRIMO";
38. RAEKWON PARIS,
        A/K/A "KING DEBO";
39. JAYCO REYES-SMITH,
        A/K/A "KING JAVY"
40. LUIS SANTIAGO,
        A/K/A "KING TINY";
41. ROBERTO VARGAS,
        A/K/A "KING ROYALTY";

8

42. JOSE VASQUEZ,
   A/K/A "KING FEARLESS";
43. NATANAEL VELAZQUEZ,
   A/K/A "KING NAEL";
44. ISRAEL RODRIGUEZ,
   A/K/A "KING IMPERIAL";
45. ALFRED NIEVES,
   A/K/A "KING ALFY"; and
46. MARLON RIVERA,
   A/K/A "KING PLUTO";

4.  The LATIN KINGS, including its leadership, membership, and associates, constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The enterprise constituted an ongoing organization whose members functioned as a continuing unit with a common purpose of achieving the objectives of the enterprise. The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

### Purposes of the Enterprise

5.  The purposes of the LATIN KINGS enterprise included the following:

a.  Enriching the leaders, members, and associates of the enterprise through, among other things, the illegal manufacturing, distribution and trafficking of controlled substances;

b.  Preserving and protecting the power, territory, operations, proceeds, and prestige of the LATIN KINGS through the use of intimidation, threats of violence, violence (including acts involving murder, robbery, and assault), extortion, destruction of property, stash houses, and social media;

c.  Promoting and enhancing the LATIN KINGS and its members' and associates' activities;

9

d.      Keeping victims in fear of the LATIN KINGS and in fear of its leaders, members, and associates through threats of violence and violence;

e.      Taking all steps necessary to prevent detection and prosecution of the LATIN KINGS' criminal activities by the use of violence and intimidation against witnesses, victims, those cooperating with law enforcement, and others. F o r i n s t a n c e ,  in order to substantiate potential cooperation with law enforcement, LATIN KINGS' members obtained and disseminated "paperwork" consisting of court files and other official documentation of individuals purportedly cooperating with law enforcement.  This paperwork was then reviewed by the LATIN KINGS to confirm whether an individual had, in fact, provided information to law enforcement.

f.      Promoting and enhancing the prestige, reputation, and position of the enterprise with respect to rival criminal organizations;

g.      Laundering proceeds derived from racketeering activity, and conversion of proceeds to assets and other things of value;

h.      Keeping victims, potential victims, and community members in fear of the enterprise and its members and associates; and

i.      Ensuring discipline within the enterprise and compliance with the enterprise's rules by members and associates through threats of violence and acts of violence.

<u>Manner and Means of the Enterprise</u>

6.      The manner and means of the LATIN KINGS enterprise included the following:

a.      All LATIN KINGS were expected to commit acts of violence to maintain membership and discipline within the gang, including violence against rival

10

gang members (or those perceived to be rival gang members), as well as members and associates of the LATIN KINGS who violated the gang's rules. LATIN KINGS were also expected to participate in assaults to initiate prospects into, or expel members and prospects from, the gang.

      b.      LATIN KINGS' ranking members had the authority within the gang to order other subordinate members to complete tasks or assignments that would serve a purpose for the LATIN KINGS. These tasks ranged from a leader ordering a "B.O.S." (beat down on sight) or "S.O.S." (smash on sight), meaning the assault of a rival gang member or a LATIN KINGS member who had committed a violation of the LATIN KINGS' rules, to a "green light" or "K.O.S." (kill on sight), meaning the murder of a rival gang member or of a LATIN KINGS member who may have committed an egregious violation of the gang's rules. Failure to perform such a task, known as "standing idle," often resulted in the assigned member being punished. Punishment for failing to comply with an order ranged from a physical beating to death.

      c.      LATIN KINGS' leaders also had the authority to mete out "green lights," or "violations" or punishment for failing to abide by the rules or code of the LATIN KINGS, such as the use of a prohibited substance, or failure to pay dues. For example, failure to pay dues often resulted in a violation of "2 for 45," which entailed two LATIN KINGS members assaulting the individual for 45 seconds. The sharing of sensitive gang-related information often resulted in a "head-to-toe," or "pumpkin head," which consisted of the violator being beaten by multiple LATIN KINGS' members who assaulted that individual all over his body for a specified period of time. The duration and substance of the violation depended on the

11

seriousness of the conduct. A more egregious violation resulted in the killing of that member.

d.      Typically, more serious tasks, such as the decision to order a retaliatory shooting, fell within the discretion of the Regional Officers or Chapter Inca, depending on the basis for the incident. A Chapter's Inca could bring such a decision to the State Team, who would relay their orders back to the Chapter's Inca. The Chapter's Inca would then relay the orders to the Chapter's Cacique, Enforcer(s), and other members. Decisions on matters of less significance - such as member violations - would generally fall to the Chapter's Inca. There were procedures for the Chapter's ranking members to overrule the Chapter Inca's decisions through involvement of the Regional Officers and State Team.

e.      Those seeking membership in the LATIN KINGS were first required to become "prospects" or probationary members ("probies") for six to 12 months. LATIN KINGS prospects were usually tasked with committing a variety of criminal acts, including holding firearms and narcotics. Prospects were also often required to take the blame for criminal acts, and were prohibited from implicating members in these criminal acts. Prospects were required to complete an initiation process, often referred to as being "jumped in," during which prospects were assaulted by other LATIN KINGS members. Similarly, those who left, or were forced out of the gang, faced an assault and became "ex-ed out."

f.      As described above, LATIN KINGS' members and prospects were required to adhere to a written "constitution" and "manifesto," outlining their organizational structure, various "prayers," codes of behavior, and rituals.   This

12

"manifesto" was widely distributed to members throughout the country. Prospective LATIN KINGS' members were required to memorize "knowledge" and attend "class" regarding the structure, rituals and behavioral codes of the LATIN KINGS before they could become full members.

g.     Members of the LATIN KINGS were also traditionally given "King Names" or "Queen Names," which were names other than their legal names and names by which they were known to members of the gang and to others on the street.   One of the purpose of having "King Names" or "Queen Names," was to obfuscate the identities of members from law enforcement.

h.     LATIN KINGS' members communicated with members of their own chapter and members across the United States in person and through the use of telephone, e-mail, and social networking sites.

i.     Members of the LATIN KINGS greeted each other and showed their membership in the gang by using a set of hand-gang signs, each intended to evoke the shape of a crown.  In addition, LATIN KINGS often greeted one another, demonstrating their allegiance to the gang, or simply announced their arrival or presence in a particular area, by exclaiming "ADR" or "Amor De Rey," which means "King's Love" in Spanish. Other phrases unique to the LATIN KINGS lexicon include "360," "ALKN," "ALKQN," "Crown," "Lion," "Lion Tribe," "Motherland," "KMC," "Kingism," and "Bloodline." The LATIN KINGS employed a robust symbology as well, often using depictions of five-pointed crowns, lions, and Inca- or Aztec-inspired artwork to demonstrate their affiliation.  Members often had tattoos incorporating one or more of the aforementioned phrases or symbols, the crown and the lion being the most

13

prominent.  The gang also incorporated these phrases and symbols into graffiti, which they used to mark their territory or announce their presence in a particular area.  The colors associated with the LATIN KINGS were black and gold, and members of the LATIN KINGS often demonstrated their affiliation with the LATIN KINGS by wearing clothing containing the colors black and gold, or incorporating some of the gang's other symbols or phrases.

   j. LATIN KINGS' members were expected to protect the name, reputation, and status of the gang from rival gang members and other persons.  The LATIN KINGS required that all individuals show respect and deference to the gang and its membership.  To protect the gang and enhance its reputation, LATIN KINGS' members were expected to use any means necessary to enforce respect from those who show disrespect, including acts of intimidation and violence.

<u>The Racketeering Conspiracy</u>

   7. From a time unknown to the Grand Jury, but not later than approximately April 2009, and continuing until the present, at Boston, Lawrence, Lowell, Springfield, Fitchburg, Salem, Lynn, Chelsea, New Bedford, Worcester, and elsewhere in the District of Massachusetts, and at other places presently known and unknown, the defendants,

    1. MICHAEL CECCHETELLI,
      A/K/A "KING MERLIN";
    2. ESTHER ORTIZ,
      A/K/A "QUEEN INDIA";
    3. HECTOR MANUEL VEGA,
      A/K/A "KING DEMON";
    4. JORGE RODRIGUEZ,
      A/K/A "KING G";
    5. MICHAEL MARRERO,
      A/K/A "KING CLUMSY";

14

6.     FRANCISCO LOPEZ,
              A/K/A "KING CISCO";
7.     GREGORY PEGUERO-COLON,
              A/K/A "KING TRECE";
8.     JUAN LIBERATO,
              A/K/A "KING PRODIGY";
9.     ANGEL ROLDAN,
              A/K/A "KING BIG A,"
              A/K/A "NELTY";
10.     FRUTUOSO BARROS,
              A/K/A "KING FRUITY";
11.     SANDRA CORREA,
              A/K/A "QUEEN DREAM";
12.     SHAUN HARRISON,
              A/K/A "REV";
13.     VINCENT DZIERWINSKI,
              A/K/A "KING VICE";
14.     WILSON PEGUERO,
              A/K/A "KING DUBB";
15.     ALEXIS PEGUERO,
              A/K/A "KING LEXI,"
              A/K/A "KING LOONEY";
16.     MATTHEW PALACIOS,
              A/K/A "KING NENE";
17.     STEVEN FAMILIA VALDEZ,
              A/K/A "KING HAZE";
18.     DANTE LARA,
              A/K/A "KING NASTY";
19.     ROBERT LARA,
              A/K/A "KING RIZZ";
20.     ANGEL ORTIZ,
              A/K/A "KING ABBY";
21.     ANGEL RODRIGUEZ,
              A/K/A "KING ACE";
22.     ALEXIS VELASQUEZ,
              A/K/A "KING BOOBOO";
23.     ANGEL CALDERON,
              A/K/A "KING BAM";
24.     OSCAR PENA,
              A/K/A "KING O-BLOCK";
25.     JOSE RODRIGUEZ,
              A/K/A "KING STUTTER";
26.     ORLANDO SANTIAGO TORRES,
              A/K/A "KING LANDI";

15

27. ROBERT AVITABILE,
    A/K/A "BOBBY"
28. TALIYAH BARBOZA,
    A/K/A "QUEEN TALIYAH";
29. JOSUE CARRASQUILLO,
    A/K/A "KING PLAYBOY";
30. MICHAEL COTTO,
    A/K/A "KING GORDO";
31. JUAN FIGUEROA,
    A/K/A "KING PUN";
32. ISSAC FELIX-RIVERA,
    A/K/A "KING IZZY";
33. KEVIN GUADALUPE,
    A/K/A "KING MILLY";
34. SHELTON JOHNSON,
    A/K/A "KING SHELLS";
35. TYSON JORGE,
    A/K/A "KING MUSIC";
36. EMANUEL LOPEZ-VELEZ,
    A/K/A "MANNY";
37. LUIS MENDEZ,
    A/K/A "KING PRIMO";
38. RAEKWON PARIS,
    A/K/A "KING DEBO";
39. JAYCO REYES-SMITH,
    A/K/A "KING JAVY"
40. LUIS SANTIAGO,
    A/K/A "KING TINY";
41. ROBERTO VARGAS,
    A/K/A "KING ROYALTY";
42. JOSE VASQUEZ,
    A/K/A "KING FEARLESS";
43. NATANAEL VELAZQUEZ,
    A/K/A "KING NAEL";
44. ISRAEL RODRIGUEZ,
    A/K/A "KING IMPERIAL";
45. ALFRED NIEVES,
    A/K/A "KING ALFY"; and
46. MARLON RIVERA,
    A/K/A "KING PLUTO";

and others known and unknown to the Grand Jury, being persons employed by and associated with

the LATIN KINGS, an enterprise which was engaged in, and the activities of which affected,

16

interstate and foreign commerce, did knowingly conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the LATIN KINGS' enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and (5).

8.    The aforementioned pattern of racketeering activity consisted of multiple:

a.    acts and threats involving murder, in violation of Massachusetts General Laws, Chapter 265, Section 1 (murder), Section 15 (assault with intent to murder), and Section 18 (armed assault with intent to murder), and Massachusetts General Laws, Chapter 274, Section 2 (aiding and abetting and accessory before the fact to a felony), Section 3 (counseling or procuring of a felony), Section 6 (attempt to commit a crime), Section 7 (conspiracy to commit a crime), and Section 8 (solicitation of a felony);

b.    acts and threats involving robbery, in violation of Massachusetts General Laws, Chapter 265, Section 17 (armed robbery), Section 18 (armed assault with intent to rob), Section 19 (unarmed robbery), Section 20 (unarmed assault with intent to rob) and Massachusetts General Laws, Chapter 274, Section 2 (aiding and abetting of a felony and accessory before the fact to a felony), Section 3 (counseling or procuring of a felony), Section 6 (attempt to commit a crime), Section 7 (conspiracy to commit to commit a crime); and Section 8 (solicitation of a felony);

c.    acts indictable under 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant);

d.    acts indictable under 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant);

17

e.      acts indictable under 18 U.S.C. § 1956 (relating to the laundering of monetary instruments);

f.      offenses involving the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance, including cocaine, cocaine-base, heroin, fentanyl, and marijuana, as well as conspiracy to commit the offenses, in violation of the laws of the United States, including 21 U.S.C. §§ 841, 843, and 846.

9.      It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

<u>Manner and Means of the Conspiracy</u>

10.     Among the manner and means by which the defendants and their co-conspirators conducted and participated in the conduct of the affairs of the LATIN KINGS' enterprise were the following:

a.      The members of the enterprise and their associates attended regular meetings, at which they discussed, planned, and otherwise engaged in criminal activity, including acts involving murder, robbery, assault, laundering of monetary instruments, various firearms offenses, and narcotics distribution.

b.      Members of the enterprise and their associates initiated members through the practice of causing them to endure physical assaults conducted by members of the enterprise at various gang-related gatherings.

c.      To enforce discipline and the rules of the enterprise, members of the enterprise and their associates engaged in a system of "violations," "green light,"

"excommunication," and "termination," in which the defendants and others attempted to murder, conspired to murder, and physically beat and threatened those members of the enterprise who violated rules, questioned authority, or posed a threat to the leaders and purposes of the enterprise.

      d.    Members of the enterprise were prohibited from sharing gang information with persons outside the enterprise to ensure that federal and state law enforcement were prevented from bringing criminal cases or charges against the enterprise and/or its members and associates.

      e.    Members of the enterprise and their associates employed and used social media, gang-related terminology, symbols, gestures, and color schemes.

      f.    To perpetuate the enterprise and to maintain and extend their power, members of the enterprise and their associates committed illegal acts, including acts involving murder, robbery, and assault against individuals who posed a threat to the enterprise or jeopardized its operations, including rival gang members and witnesses to the illegal activities of the enterprise. Pursuant to gang policy, members of the enterprise and their associates were required to participate in such acts, received standing orders to shoot rival gang members, and were instructed to retaliate for gang-related attacks upon the members and associates of the enterprise.

      g.    Members of the enterprise and their associates managed the procurement, transfer, use, concealment, and disposal of firearms and dangerous weapons within the enterprise to protect gang-related territory, personnel, and operations, and to deter, eliminate, and retaliate against competitors and other rival criminal organizations and

19

persons. Members typically referred to firearms collected and circulated in such manner as "Nation" guns. Nation guns were guns owned by the LATIN KINGS and available for members and associates to use to conduct LATIN KINGS business.

      h.      Members of the enterprise and their associates were required to jump in and/or assist other gang members who were involved in altercations or fights, to include undertaking retaliatory assaults or other violent acts to ensure the standing and reputation of the enterprise was not diminished. If a member "stood idle" when required to assist, that member would be in violation of gang rules and subject to discipline.

      i.      Members of the enterprise and their associates were required to undertake security measures at meetings, such as standing guard in order to ensure that no recording devices were brought in by attendees.

      j.      Members of the enterprise and their associates earned money for their members and regularly financed their activities through funds obtained in the illegal trafficking of controlled substances, including the distribution and possession with intent to distribute of cocaine, cocaine base, fentanyl, and marijuana.

      k.      Members of the enterprise and their associates operated and conducted their affairs, in part, through a system in which the Chapter and Regional leadership of the LATIN KINGS and others, possessed, controlled, and otherwise maintained a monetary stash on behalf of the enterprise. As part of this practice, the members of the enterprise and their associates paid requisite monthly dues into the "Box," "Fundo," or "Caja" which, in turn, the enterprise used to bail gang members out of jail, to send money to incarcerated gang members and to purchase and sell firearms and controlled

substances. At times, the members of the enterprise and their associates paid dues by selling narcotics.

l.      Members of the enterprise and their associates, in, accordance with LATIN KINGS' rules, policies and orders, deceived and attempted to deceive by taking the blame or admitting to crimes that were committed by other LATIN KINGS' members or associates.

m.      Members of the enterprise and their associates hid, misrepresented, concealed, and caused to be misrepresented, concealed, and hidden, acts done in furtherance of the conspiracy, and used coded language and other means to avoid detection and apprehension by law enforcement authorities.

n.      Members of the enterprise recruited and used juveniles to commit acts for the benefit of the enterprise.

o.      Through an association with ROBERT AVITABILE, a property-owner who was an associate of the LATIN KINGS, the LATIN KINGS' enterprise obtained *de facto* control over a number of multiple-unit apartment buildings in the New Bedford, Massachusetts. The LATIN KINGS used these apartment buildings for the purposes of insulating and establishing an organized conspiracy to distribute large amounts of controlled substances, including cocaine and cocaine base, also known as crack-cocaine. From the volume of police calls, search warrants, gang activity, shootings, overdoses, and arrests, these apartment buildings became notoriously known to the public, rival gangs, and law enforcement as LATIN KINGS' trap houses.

p.      Ranking members of the LATIN KINGS were assigned to reside in one apartment and oversee the distribution of controlled substances within that trap house.  These ranking members would purchase wholesale quantities of cocaine and cocaine base from ranking members of the LATIN KINGS, and manage the distribution within their assigned trap house on behalf of the LATIN KINGS.

q.      LATIN KINGS' members from other parts of Massachusetts and other states would routinely travel to New Bedford to use the network of trap houses to enrich themselves and their respective chapters through the distribution of cocaine base.  Firearms, larger quantities of controlled substances, and the drug proceeds would be stored in the apartments of the ranking members in order to ensure protection and security for the controlled substances and proceeds derived from their sale.

r.      Other apartments in the same trap house would be assigned to lower level members and associates of the LATIN KINGS who served as "workers."  The workers would conduct retail sales of controlled substances to drug customers in their apartment, and later pay the proceeds to the ranking member.  In this way, the ranking member would be insulated from surveillance and infiltration by traditional law enforcement methods.

s.      The LATIN KINGS employed this network of trap houses in the northern part of New Bedford to facilitate an extremely lucrative system of drug distribution, conduct meetings, store and maintain firearms and ammunition, store drug proceeds, cook crack-cocaine, and coordinate before and after acts of violence,

22

including shootings and attempted murders.

t.     The network of trap houses became strongholds of the LATIN KINGS' power and influence and were bases of operations for LATIN KINGS' violence and drug trafficking. This network of trap houses greatly enhanced the prestige of the LATIN KINGS and permitted them to project the power of the criminal enterprise across the northern end of New Bedford.

u.     AVITABILE was aware of the criminal activity taking place within the trap houses that he owned and managed. Additionally, AVITABILE undertook efforts to launder the proceeds of the LATIN KINGS' drug distribution into valuable assets, through the use of illegal drug proceeds to finance the renovation of distressed properties and the trap houses.

All in violation of Title 18, United States Code, Section 1962(d).

COUNT TWO
Conspiracy to Manufacture, Distribute and Possess with Intent to Distribute Cocaine and
Cocaine Base
(21 U.S.C. § 846)

The Grand Jury further charges:

11.     From a time unknown to the Grand Jury, and continuing until in or about December

2019, in Boston, in the District of Massachusetts, and elsewhere, the defendants,

|  |  |
|---|---|
| 4. | JORGE RODRIGUEZ,<br>A/K/A "KING G"; |
| 25. | JOSE RODRIGUEZ,<br>A/K/A "KING STUTTER"; |
| 26. | ORLANDO SANTIAGO TORRES,<br>A/K/A "KING LANDI"; |
| 27. | ROBERT AVITABILE,<br>A/K/A "BOBBY"; |
| 41. | ROBERTO VARGAS,<br>A/K/A "KING ROYALTY"; |
| 47. | INES LUGO,<br>A/K/A "QUEEN CHINA"; |
| 48. | JEREMIA MEDINA,<br>A/K/A "KING SWEEPY"; |
| 49. | BIENVENIDO NUNEZ,<br>A/K/A "KING APACHE"; |
| 50. | TANAIRY RUIZ,<br>A/K/A "QUEEN TANAIRY"; |
| 51. | XAVIER VALENTIN-SOTO,<br>A/K/A "KING X"; |
| 52. | JOEL FRANCISCO,<br>A/K/A "KING CASPER"; and |
| 53. | ERIC THOMAS,<br>A/K/A "KING E"; |

conspired with each other, and with other persons known and unknown to the Grand Jury to

knowingly and intentionally manufacture, distribute, and possess with intent to distribute a mixture

and substance containing a detectable amount of cocaine, a Schedule II controlled substance, and

a mixture and substance containing a detectable amount of cocaine base, also known as crack

cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

All in violation of Title 21, United States Code, Section 846.

## COUNT THREE
### Distribution of and Possession with Intent to Distribute Cocaine
### (21 U.S.C. § 841(a)(1))

The Grand Jury further charges:

12.    On or about May 8, 2019, in Worcester, in the District of Massachusetts, the

defendant,

54.    ALVIN MOJICA,
A/K/A "KING HUMBLE,"

did knowingly and intentionally distribute and possess with intent to distribute a mixture and

substance containing a detectable amount of cocaine, a Schedule II controlled substance.

All in violation of Title 21, United States Code, Section 841(a)(1).

COUNT FOUR
Conspiracy to Distribute and to Possess with Intent to Distribute Fentanyl
(21 U.S.C. § 846)

The Grand Jury further charges:

13.     Between in or about April 2017 and December 2017, in Leominster and Fitchburg,

in the District of Massachusetts, the defendants,

> 55.     SOPHIA VELASQUEZ,
>             A/K/A "QUEEN SOPHIA"; and
> 56.     DAIRON RIVERA,
>             A/K/A "KING MAFIA";

conspired with each other and with other persons known and unknown to the Grand Jury, to

knowingly and intentionally distribute and possess with intent to distribute a mixture and substance

containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide,

also known as fentanyl, a Schedule II controlled substance, in violation of Title 21, United States

Code, Section 841(a)(1).

All in violation of Title 21, United States Code, Section 846.

<u>COUNT FIVE</u>
Felon in Possession of Ammunition
(18 U.S.C. § 922(g)(1))

The Grand Jury further charges:

14.     On or about May 15, 2019, in Chicopee, in the District of Massachusetts, the

defendant,

57.     HECTOR ADORNO,
A/K/A "KING GORDO,"

knowing that he was previously convicted in a court of a crime punishable by imprisonment for a

term exceeding one year, did knowingly possess, in and affecting commerce, 15 rounds of

ammunition recovered from a "Ghost Gun."

All in violation of Title 18, United States Code, Section 922(g)(1).

## COUNT SIX
Conspiracy to Distribute and to Possess with Intent to Distribute Cocaine Base
(21 U.S.C. § 846)

The Grand Jury further charges:

15.     From a date unknown to the Grand Jury, but between at least in or about January

2015 and March 2015, in Boston, in the District of Massachusetts, the defendants,

                58.     JESUS DIAZ,
                            A/K/A "KING KIKO";
                59.     HENRY CARIBE,
                            A/K/A "KING 40CAL";

conspired with each other and with other persons known and unknown to the Grand Jury, to

knowingly and intentionally distribute and possess with intent to distribute a mixture and substance

containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II

controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

        All in violation of Title 21, United States Code, Section 846.

<u>COUNT SEVEN</u>
Felon in Possession of Ammunition
(18 U.S.C. § 922(g)(1))

The Grand Jury further charges:

16.     On or about July 9, 2019, in Springfield, in the District of Massachusetts, the

defendant,

60.     JONATHAN CASSIANO,
A/K/A "KING LEGEND,"

knowing that he was previously convicted in a court of a crime punishable by imprisonment for a

term exceeding one year, did knowingly possess, in and affecting commerce, 15 rounds of

ammunition recovered from a "Ghost Gun."

All in violation of Title 18, United States Code, Section 922(g)(1).

30

COUNT EIGHT
Felon in Possession of Firearms and Ammunition
(18 U.S.C. § 922(g)(1))

The Grand Jury further charges:

17.     On or about September 13, 2019, in Springfield, in the District of Massachusetts, the defendant,

61.     ANTOINE GOODSON,

knowing that he was previously convicted in a court of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess, in and affecting commerce, firearms and ammunition, that is: a (1) Glock 41, .45 caliber pistol bearing serial # XZA811; (2) a Beretta, model 9000 S, 9mm caliber pistol bearing serial # SZ00755; (3) a Sig Sauer P250, .40 caliber pistol, bearing serial # EAK014800; (4) a Dornaus-Dixon Enterprises, model Bren Ten, 10mm caliber pistol, bearing serial # 84SFD)148; (5) a Dan Wesson Arms .357 Magnum CTG Revolver, bearing serial # 317722; and (6) Seven .45 caliber rounds of ammunition containing the head-stamp: "FEDERAL 45 Auto"; eight rounds of 9 millimeter ammunition containing head-stamp "WIN 9mm Luger"; twelve rounds of .40 caliber ammunition containing head-stamp "WIN 40 S&W"; one round of .40 caliber ammunition containing the head-stamp "R-P 40 S&W"; two rounds of .357 ammunition containing the head-stamp "R-P 357 MAGNUM"; two rounds of .357 ammunition containing the head-stamp "AGUILA 357 MAG"; nine rounds of .45 caliber ammunition containing the head-stamp "Tulammo 45 AUTO"; and one round of .45 caliber ammunition containing head-stamp "ATL ARMS 45 ACP".

All in violation of Title 18, United States Code, Section 922(g)(1).

## COUNT NINE
Felon in Possession of Firearm and Ammunition
(18 U.S.C. § 922(g)(1))

The Grand Jury further charges:

18.     On or about April 18, 2017, in Fitchburg, in the District of Massachusetts, the defendant,

62.     DEREK SOUTHWORTH,

knowing that he was previously convicted in a court of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess, in and affecting commerce, a firearm and ammunition, that is, a SA/CUGIR, model GPO WASR 10/63, 7.62 x 39 millimeter rifle, bearing serial number 19855-BG-0210, and 49 rounds of rifle ammunition.

All in violation of Title 18, United States Code, Section 922(g)(1).

RICO FORFEITURE ALLEGATION
(18 U.S.C. § 1963(a))

The Grand Jury further finds:

1.      Upon conviction of the offense in violation of Title 18, United States Code,

Section 1962, set forth in Count One, the defendants,

1.      MICHAEL CECCHETELLI,
            A/K/A "KING MERLIN";
2.      ESTHER ORTIZ,
            A/K/A "QUEEN INDIA";
3.      HECTOR MANUEL VEGA,
            A/K/A "KING DEMON";
4.      JORGE RODRIGUEZ,
            A/K/A "KING G";
5.      MICHAEL MARRERO,
            A/K/A "KING CLUMSY";
6.      FRANCISCO LOPEZ,
            A/K/A "KING CISCO";
7.      GREGORY PEGUERO-COLON,
            A/K/A "KING TRECE";
8.      JUAN LIBERATO,
            A/K/A "KING PRODIGY";
9.      ANGEL ROLDAN,
            A/K/A "KING BIG A,"
            A/K/A "NELTY";
10.     FRUTUOSO BARROS,
            A/K/A "KING FRUITY";
11.     SANDRA CORREA,
            A/K/A "QUEEN DREAM";
12.     SHAUN HARRISON,
            A/K/A "REV";
13.     VINCENT DZIERWINSKI,
            A/K/A "KING VICE";
14.     WILSON PEGUERO,
            A/K/A "KING DUBB";
15.     ALEXIS PEGUERO,
            A/K/A "KING LEXI,"
            A/K/A "KING LOONEY";
16.     MATTHEW PALACIOS,
            A/K/A "KING NENE";
17.     STEVEN FAMILIA VALDEZ,
            A/K/A "KING HAZE";

33

18.  DANTE LARA,
        A/K/A "KING NASTY";
19.  ROBERT LARA,
        A/K/A "KING RIZZ";
20.  ANGEL ORTIZ,
        A/K/A "KING ABBY";
21.  ANGEL RODRIGUEZ,
        A/K/A "KING ACE";
22.  ALEXIS VELASQUEZ,
        A/K/A "KING BOOBOO";
23.  ANGEL CALDERON,
        A/K/A "KING BAM";
24.  OSCAR PENA,
        A/K/A "KING O-BLOCK";
25.  JOSE RODRIGUEZ,
        A/K/A "KING STUTTER";
26.  ORLANDO SANTIAGO TORRES,
        A/K/A "KING LANDI";
27.  ROBERT AVITABILE,
        A/K/A "BOBBY"
28.  TALIYAH BARBOZA,
        A/K/A "QUEEN TALIYAH";
29.  JOSUE CARRASQUILLO,
        A/K/A "KING PLAYBOY";
30.  MICHAEL COTTO,
        A/K/A "KING GORDO";
31.  JUAN FIGUEROA,
        A/K/A "KING PUN";
32.  ISSAC FELIX-RIVERA,
        A/K/A "KING IZZY";
33.  KEVIN GUADALUPE,
        A/K/A "KING MILLY";
34.  SHELTON JOHNSON,
        A/K/A "KING SHELLS";
35.  TYSON JORGE,
        A/K/A "KING MUSIC";
36.  EMANUEL LOPEZ-VELEZ,
        A/K/A "MANNY";
37.  LUIS MENDEZ,
        A/K/A "KING PRIMO";
38.  RAEKWON PARIS,
        A/K/A "KING DEBO";
39.  JAYCO REYES-SMITH,
        A/K/A "KING JAVY"

34

40.  LUIS SANTIAGO,
        A/K/A "KING TINY";
41.  ROBERTO VARGAS,
        A/K/A "KING ROYALTY";
42.  JOSE VASQUEZ,
        A/K/A "KING FEARLESS";
43.  NATANAEL VELAZQUEZ,
        A/K/A "KING NAEL";
44.  ISRAEL RODRIGUEZ,
        A/K/A "KING IMPERIAL";
45.  ALFRED NIEVES,
        A/K/A "KING ALFY"; and
46.  MARLON RIVERA,
        A/K/A "KING PLUTO";

shall forfeit to the United States pursuant to Title 18, United States Code, Section 1963:

a.  any interest acquired or maintained in violation of Title 18, United States Code, Section 1962;

b.  any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and

c.  any property constituting, or derived from, any proceeds obtained, directly and indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962.

The property to be forfeited includes, but is not limited to, the following assets:

a.  the real property located at 104 Tallman Street, New Bedford, MA;

b.  the real property located at 358 North Front Street, New Bedford, MA;

c.  the real property located at 239 Sawyer Street, New Bedford, MA;

d.  the real property located at 585 Elm Street, New Bedford, MA;

35

e. one 2008 white Chevrolet Silverado, VIN: 2GCEC19C181148562;

f. one 2013 white Dodge Avenger 2013, VIN: 1C3CDZAB2DN681409;

g. one 2006 white Ford E-350, VIN: 1FBNE31L56DA19618;

h. one 2007 blue GMC Sierra, VIN: 1GTEK19J17Z553439;

i. one 2009 black BMW 750I, VIN: WBAKA83529CY33349; and

j. one 2006 gray Porsche Cayman, VIN: WP0AB29816U782006.

2.    If any of the property described in Paragraph 1, above, as being forfeitable pursuant to Title 18, United States Code, Section 1963(a), as a result of any act or omission of the defendants—

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 1963.

## DRUG FORFEITURE ALLEGATION
### (21 U.S.C. § 853)

The Grand Jury further finds:

1.     Upon conviction of the offense in violation of Title 21, United States Code,

Section 846, set forth in Counts Two, Four, and Six, and of the offense in violation of Title 21,

United States Code, Section 841(a)(1), set forth in Count Three, the defendants,

| | |
|---|---|
| 4. | JORGE RODRIGUEZ, |
| | A/K/A "KING G"; |
| 25. | JOSE RODRIGUEZ, |
| | A/K/A "KING STUTTER"; |
| 26. | ORLANDO SANTIAGO TORRES, |
| | A/K/A "KING LANDI"; |
| 27. | ROBERT AVITABILE, |
| | A/K/A "BOBBY"; |
| 41. | ROBERTO VARGAS, |
| | A/K/A "KING ROYALTY"; |
| 47. | INES LUGO, |
| | A/K/A "QUEEN CHINA"; |
| 48. | JEREMIA MEDINA, |
| | A/K/A "KING SWEEPY"; |
| 49. | BIENVENIDO NUNEZ, |
| | A/K/A "KING APACHE"; |
| 50. | TANAIRY RUIZ, |
| | A/K/A "QUEEN TANAIRY"; |
| 51. | XAVIER VALENTIN-SOTO, |
| | A/K/A "KING X"; |
| 52. | JOEL FRANCISCO, |
| | A/K/A "KING CASPER"; |
| 53. | ERIC THOMAS, |
| | A/K/A "KING E"; |
| 54. | ALVIN MOJICA, |
| | A/K/A "KING HUMBLE"; |
| 55. | SOPHIA VELASQUEZ, |
| | A/K/A "QUEEN SOPHIA"; |
| 56. | DAIRON RIVERA, |
| | A/K/A "KING MAFIA"; |
| 58. | JESUS DIAZ, |
| | A/K/A "KING KIKO"; and |

37

59.    HENRY CARIBE,
A/K/A "KING 40CAL";

shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any

property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of

such offense; and any property used, or intended to be used, in any manner or part, to commit, or

to facilitate the commission of, such offense.  The property to be forfeited includes, but is not

limited to, the following assets:

   a.   the real property located at 104 Tallman Street, New Bedford, MA;

   b.   the real property located at 358 North Front Street, New Bedford, MA;

   c.   the real property located at 239 Sawyer Street, New Bedford, MA;

   d.   the real property located at 585 Elm Street, New Bedford, MA;

   e.   one 2008 white Chevrolet Silverado, VIN: 2GCEC19C181148562;

   f.   one 2013 white Dodge Avenger 2013, VIN: 1C3CDZAB2DN681409;

   g.   one 2006 white Ford E-350, VIN: 1FBNE31L56DA19618;

   h.   one 2007 blue GMC Sierra, VIN: 1GTEK19J17Z553439;

   i.   one 2009 black BMW 750I, VIN: WBAKA83529CY33349; and

   j.   one 2006 gray Porsche Cayman, VIN: WP0AB29816U782006.

2.    If any of the property described in Paragraph 1, above, as being forfeitable

pursuant to Title 21, United States Code, Section 853, as a result of any act or omission of the

defendants --

   a.   cannot be located upon the exercise of due diligence;

   b.   has been transferred or sold to, or deposited with, a third party;

   c.   has been placed beyond the jurisdiction of the Court;

38

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 1 above.

All pursuant to Title 21, United States Code, Section 853.

## FIREARM FORFEITURE ALLEGATION
### (18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c))

The Grand Jury further finds:

1.     Upon conviction of an offense in violation of Title 18, United States Code, Section

922(g)(1), set forth in Counts Five, Seven, Eight and Nine, the defendants,

> 57.    HECTOR ADORNO,
>           A/K/A "KING GORDO";
> 60.    JONATHAN CASSIANO,
>           A/K/A "KING LEGEND";
> 61.    ANTOINE GOODSON; and
> 62.    DEREK SOUTHWORTH,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d)(1),

and Title 28, United States Code, Section 2461(c), any firearm or ammunition involved in or

used in any knowing commission of the offense.  The property to be forfeited includes, but is

not limited to, the following:

> a.  15 rounds of ammunition,
>
> b.  15 rounds of ammunition,
>
> c.  a Glock 41, .45 caliber pistol bearing serial # XZA811;
>
> d.  a Beretta, model 9000 S, 9mm caliber pistol bearing serial # SZ00755;
>
> e.  a Sig Sauer P250, .40 caliber pistol, bearing serial # EAK014800;
>
> f.  a Dornaus-Dixon Enterprises, model Bren Ten, 10mm caliber pistol, bearing serial # 84SFD)148;
>
> g.  a Dan Wesson Arms .357 Magnum CTG Revolver, bearing serial # 317722;
>
> h.  (7) rounds of .45 caliber rounds of ammunition containing the head-stamp: "FEDERAL 45 Auto";
>
> i.  (8) rounds of 9 millimeter ammunition containing head-stamp "WIN 9mm Luger";

j.   (12) rounds of .40 caliber ammunition containing head-stamp "WIN 40 S&W";

k.   (1) round of .40 caliber ammunition containing the head-stamp "R-P 40 S&W";

l.   (2) rounds of .357 ammunition containing the head-stamp "R-P 357 MAGNUM";

m.   (2) rounds of .357 ammunition containing the head-stamp "AGUILA 357 MAG";

n.   (9) rounds of .45 caliber ammunition containing the head-stamp "Tulammo 45 AUTO";

o.   (1) round of .45 caliber ammunition containing head-stamp "ATL ARMS 45 ACP"

p.   a SA/CUGIR, model GPO WASR 10/63, 7.62 x 39 millimeter rifle, bearing serial number 19855-BG-0210; and

q.   48 rounds of rifle ammunition.

2.       If any of the property described in Paragraph 1, above, as being forfeitable

pursuant to Title 18, United States Code, Section 924(d)(1), and Title 28, United States Code,

Section 2461(c), as a result of any act or omission of the defendants --

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 924, and Title 28, United States Code, Section 2461.

A TRUE BILL

FOREPERSON

EMILY CANNON
PHILIP MALLARD
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: DECEMBER ___4___, 2019
Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK   12/4/2019

@ 1:38pm